# Exhibit B



IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 12-48803-CA-02

ANTONIO CABALLERO,

    Plaintiff,

vs.

FUERZAS ARMADAS
REVOLUCIONARIAS DE COLOMBIA,
a/k/a FARC-EP a/k/a REVOLUTIONARY
ARMED FORCES OF COLOMBIA;
EJERCITO DE LIBERACION NACIONAL
a/k/a ELN a/k/a NATIONAL LIBERATION
ARMY; and THE NORTE DE VALLE
CARTEL;

    Defendants.

_____/



## CORRECTED SECOND AMENDED COMPLAINT

    Plaintiff, ANTONIO CABALLERO ("Plaintiff"), files this corrected Second Amended Complaint (correcting a scrivener's error), and sues Defendants, FUERZAS ARMADAS REVOLUCIONARIOS DE COLOMBIA ("FARC"), EJERCITO DE LIBERACION NACIONAL ("ELN"), and THE NORTE DE VALLE CARTEL ("NDVC") (collectively "Defendants"), and alleges as follows:

### PRELIMINARY STATEMENT

    1.    This is a civil action for damages in excess of one hundred million dollars arising out of injury to Plaintiff due to the Defendants' unlawful kidnapping, trafficking, detention,

torture, and killing of Plaintiff's father, Senator and Ambassador of the nation of Colombia,

Carlos Caballero ("the Victim"), as well as the threat to Plaintiff's life which deprived them of

their property and businesses in Colombia, in violation of international law (via the Alien Tort

Statute), Colombian law (via Florida's "significant relationship" choice of law test), Federal law

(via Civil Racketeer Influenced and Corrupt Organizations) and Florida law (via Florida's long

arm statute).

## THE PARTIES

2.      At the time of the filing of this Complaint, Plaintiff is a resident alien of the

United States residing in Florida with a present intent to make Florida his permanent home.

Although a citizen of Colombia, the Defendants' actions forced Plaintiff to flee his native

country and obtain political asylum in the United States.

3.      At all relevant times to this Complaint, Defendant, Fuerzas Armadas

Revolucionarias de Colombia ("FARC"), has been a terrorist organization and narcotics

trafficker operating in and out of Colombia.  Consequently, FARC has earned condemnation

from the United States as:

a)      a Foreign Terrorist Organization pursuant to the Immigration and

Nationality Act, 8 U.S.C. § 1189;

b)      a Specially Designated Global Terrorist pursuant to Executive Order 13224,

"Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to

Commit, or Support Terrorism"; and

c)      a Specially Designated Narcotics Trafficker Kingpin pursuant to the Foreign

Narcotics Kingpin Designation Act, 21 U.S.C. §§ 1901-1908, 8 U.S.C. § 1182.

4.     FARC is a "terrorist party" within the meaning of section 201 of the Terrorism Risk Insurance Act of 2002 ("TRIA") because it has been designated as a terrorist organization by the Secretary of State as published in the Federal Register, and because FARC has planned, prepared, solicited funds, and committed and conspired to commit terrorist activities, including but not limited to the activities set forth herein.

5.     At all relevant times to this Complaint, Defendant, Ejército de Liberación Nacional ("ELN"), is a terrorist organization and narcotics trafficker operating in and out of Colombia and using Florida as a central point in their drug distribution network.  Consequently, ELN has been designated by the United States as:

a)     A Foreign Terrorist Organization pursuant to the Immigration and Nationality Act, 8 U.S.C. § 1189; and,

b)     a Specially Designated Global Terrorist pursuant to Executive Order 13224, "Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism."

6.      ELN is a "terrorist party" within the meaning of Section 201 of TRIA because it has been designated as a terrorist organization by the Secretary of State as published in the Federal Register, and because ELN has planned, prepared, solicited funds, and committed and conspired to commit to terrorist activities, including but not limited to the activities set forth herein.

7.     At all relevant times to this Complaint, Defendant, the Norte De Valle Cartel ("NDVC") was a terrorist organization and narcotics trafficker operating in and out of Colombia and using Florida as a central point in its drug distribution network.

8.      NDVC is a "terrorist party" under section 201 of TRIA because NDVC has planned, prepared, solicited funds, and committed and conspired to commit terrorist activities, including but not limited to the activities set forth herein.

9.      At all times relevant to this Complaint, non-party Jose Luis Mejía Ramirez was a Colombian citizen and a terrorist member of ELN and co-conspirator with FARC and NDVC.

10.     At all times relevant to this Complaint, non-party Juvenal Ovidio Ricardo Palmera Pineda, a/k/a Simon Trinidad, was a Colombian citizen and a terrorist member of FARC and co-conspirator with ELN and NDVC.

11.     At all times relevant to this Complaint, non-party Diego Montoya Sanchez was a Colombian citizen and a terrorist member of NDVC and co-conspirator with ELN and FARC.


## JURISDICTION AND VENUE

12.     This action is brought pursuant to the Alien Tort Statute ("ATS") 28 U.S.C. § 1350 (as a federal question subject to non-exclusive concurrent jurisdiction), the Civil Racketeer Influenced and Corrupt Organizations Act ("Civil RICO"), 18 U.S.C. §§ 1961-1968 (as a federal question subject to non-exclusive concurrent jurisdiction), Colombia law (via Florida's "significant relationship" test), and Florida law (via Florida's long arm statute).

13.     The ATS grants non-exclusive federal jurisdiction over - and recognizes federal common law causes of action for - claims by aliens suing in tort for violations of the law of nations.

14.     In the present matter, Plaintiff is (1) an alien (2) suing for a tort (3) committed in violation of the law of nations.

15.     Pursuant to Colombian law, Plaintiff, as the son of the Victim, is entitled to claim compensation for "moral and material" damages[1] resulting from the Defendants' conduct. *See* Article 1045 of the Colombian Civil Code; Article 95 of the Colombian Criminal Code (providing for a civil action for criminal violations of Article 168 (kidnapping), Article 169 (kidnapping for ransom), and article 178 (torture), among others); *see generally, Baloco v. Drummond Company, Inc.*, 640 F.3d 1338, 1349 (11th Cir. 2011) (finding that the children of the deceased have properly alleged their entitlement to proceed as wrongful death claimants under Colombian law). Consequently, Plaintiff has standing to bring a claim under the ATS. *See Estate of Cabello v. Fernandez-Larios*, 157 F. Supp. 2d 1345, 1357-58 (S.D. Fla. 2001) (finding that plaintiffs had standing under the ATS because they had standing under Chilean law); *see also Xuncax v. Gramajo*, 886 F. Supp. 162, 178 (D. Mass. 1995) (finding standing under the ATS based on laws of Guatamala, which allowed siblings to sue for wrongful death).

16.     Federal Civil RICO also grants non-exclusive federal subject matter jurisdiction for acts that further a criminal conspiracy if that criminal conspiracy has significant effects on the United States. 18 U.S.C. § 1964(c).

17.     In the present matter, Defendants engaged in criminal conspiracies and a pattern of racketeering activity that affects the United States.

18.     Because both ATS and Civil RICO grant non-exclusive jurisdiction, this Court is presumed to have concurrent jurisdiction with federal courts as it relates to these federal questions. *Tafflin v. Levitt*, 493 U.S. 455 (1990); *Gulf Offshore Co., Div. of Pool Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478 (1981); *California v. Arizona*, 440 U.S. 59, 68 (1979).

---

[1] Pursuant to Article 5 of Colombian law such damages include transient or permanent injuries that caused some form of physical, mental, sensory, or emotional distress, financial loss, and/or impairment of fundamental rights.

## Personal and General Jurisdiction

19.     In this particular matter, the Colombian legal system does not present an adequate alternative forum for Plaintiff because returning to Colombia would place his life in extreme peril.  Specifically, traveling to Colombia to seek redress through the Colombian judicial system would result in a high likelihood that Plaintiff would be kidnapped, tortured, and/or murdered by the Defendants.   In fact, members within the Colombian law enforcement have personally warned Plaintiff that they would not be able to protect him from the Defendants while in Colombia. *See Rodriguez Licea v. Curacao Drydock Co.*, 537 F. Supp. 2d 1270 (S.D. Fla. 2008) (holding that courts should be careful not to dismiss, as inconvenient, ATS cases, when victims would be endangered merely by returning to that place to litigate); *Dole Food v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002) (confirming that the party moving to dismiss based on *forum non conveniens* bears the burden of demonstrating that an alternative forum exists).

20.     Miami-Dade County is an appropriate venue for Plaintiff to pursue this matter because he currently lives in Florida as a resident alien.  Further, all Defendants are non-residents of Florida.  As a result, pursuant to Fla. Stat. § 47.011, this action can be brought anywhere in Florida. *Holton v. Prosperity Bank*, 602 So. 2d 659, 662 n.2 (Fla. 5th DCA 1992).

21.     Furthermore, this Court has specific personal jurisdiction over the Defendants, pursuant to Fla. Stat. § 48.193(1), because Defendants have substantial, ongoing, and widespread narco-trafficking operations in Florida which have made this state a central transfer point in their drug distribution network.[2]

22.     This Court has general personal jurisdiction over the Defendants pursuant to Fla. Stat. § 48.193(2), because the Defendants have engaged in substantial and not isolated activity

_____

[2] *See* U.S. Dept. of Justice, National Drug Intelligence Ctr., Abstract, "South Florida High Intensity Drug Trafficking Area: Drug Market Analysis 2009," available at, http://www.justice.gov/archive/ndic/.

within this state as a result of their extensive and ongoing narcotics trafficking in and through Florida.

23.     Finally, constitutional due process requirements have been met in this matter because Defendants' continuous, systematic business dealings within Florida are such that they "should reasonably anticipate being haled into court [in Florida]." *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499 (Fla. 1989).   Consequently, this Court's exercise of personal jurisdiction over the Defendants should not offend, "traditional notions of fair play and substantial justice." *Id.* at 500.

24.     All conditions precedent to the bringing of this lawsuit have occurred, been excused, or have otherwise been waived.

## FACTUAL BACKGROUND
### The Global Terrorist Organization and Narcotics Trafficker FARC

25.     FARC is Latin America's oldest, largest, most capable, and best-equipped foreign terror organization, and has earned universal condemnation from the United States and international bodies as a result of its history of extreme brutality:[3]

a)      In 1997, FARC was designated by the United States as an Foreign Terrorist Organization;

b)      In 2001, FARC was designated by the United States as a Specially Designated Global Terrorist;

c)      In 2003, FARC was designated by the President of the United States as a Specially Designated Narcotics Trafficker Kingpin;

---

[3] U.S. Dept. of State, Bureau of International Narcotics and Law Enforcement Affairs, "2012 International Narcotics Control Strategy Report: Country Reports: Colombia," http://www.state.gov/j/inl/rls/nrcrpt/2012/vol1/184098.htm#Colombia

d)      The European Union has designated and sanctioned the FARC as a terrorist

organization for its breaches of international humanitarian law; and,

e)      In 2004, the United Nations' High Commissioner for Human Rights

publicly condemned FARC for violations of the Geneva Convention and international

humanitarian law arising out of FARC's massacre of seven peasants and displacement of eighty

individuals.

26.      As part of its ongoing campaign of terror, FARC strategically targets high profile

Colombian citizens, such as politicians and businessmen, using tactics such as kidnapping,

hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of

Colombia while silencing those adverse to FARC's violent agenda.

27.      FARC engages in narcotics manufacturing and trafficking as a primary means of

funding its terrorist activities against the citizens of Colombia.[4]

28.      FARC supplies at least 50% of world's cocaine.[5]

29.      FARC reportedly controls the majority of cocaine manufacturing and distribution

within Colombia and is responsible for roughly 60% of the cocaine exported from Colombia to

the United States.[6]

30.      "95.5% of the cocaine seized in the United States originates in Colombia."[7]

---

[4] United States Dept. of State, Bureau of International Narcotics and Law Enforcement Affairs, "2012 International Narcotics Control Strategy Report: Country Reports: Colombia," http://www.state.gov/j/inl/rls/nrcrpt/2012/vol1/184098.htm #Colombia.

[5] United States Drug Enforcement Administration, March 2006 News Release, "United States Charges 50 Leaders Of Narco-Terrorist FARC In Colombia With Supplying More Than Half Of The World's Cocaine," August 29, 2012, http://www.justice.gov/opa/pr/2006/March/06_crm_163.html

[6] Government Accountability Office, July 2009 Report to the Ranking Member, Committee on Foreign Relations, U.S. Senate, "Drug Control: U.S. Counternarcotics Cooperation with Venezuela Has Declined," http://www.gao.gov/new.items/d09806.pdf.

[7] U.S. Dept. of State, Bureau of W. Hemisphere Affairs, "US Relations with Colombia: Fact Sheet," http://www.state.gov/r/pa/ei/bgn/35754.htm (referencing the U.S. Department of Justice's 2010 Cocaine Signature Program).

31.  Thus, FARC is responsible for over 57.3% of the U.S. cocaine market.

32.  South Florida is a principal arrival zone and distribution center for powder cocaine and South American heroin. [8]

33.  Cocaine poses a serious threat to Florida, and is more often associated with violent crime than any other illicit drug in the State. Colombian criminal groups control transportation of cocaine to Florida and are the primary wholesale distributors of powdered cocaine.[9]

34.  Thus, Florida has become a primary point of entry and target market for FARC's cocaine trafficking.

35.  FARC operates in roughly one-third of Colombia's geographic territory.[10]

36.  In November 1998, then-President Andres Pastrana ceded a 42,000-square-mile area (roughly the size of Switzerland) in south-central Colombia to the FARC's control.

37.  FARC has actively, widely, and systematically targeted civilians during its terrorist attacks against the Colombian government.

38.  FARC and ELN are the two predominant rebel groups actively engaged against the Colombian government in a decades-long civil war, which has been ongoing since about 1964.

39.  "In addition to its attacks on Colombian military, political and economic targets, the FARC's various fronts are deeply involved in narcotics trafficking, kidnapping for ransom, extortion, murder and other criminal activities."[11]

---

[8] U.S. Dept. of Justice, National Drug Intelligence Ctr., Abstract, "South Florida High Intensity Drug Trafficking Area: Drug Market Analysis 2011," http://www.justice.gov/archive/ndic/dmas/South_Florida_DMA-2011(U).pdf

[9] *Id.*

[10] Council on Foreign Relations, "FARC, ELN: Colombia's Left-Wing Guerrillas," August 19, 2009, http://www.cfr.org/colombia/farc-eln-colombias-left-wing-guerrillas/p9272.

40.    FARC also operates outside the country of Colombia.[12]


## The Global Terrorist Organization ELN

41.    ELN is the second largest insurgent group in Colombia, after FARC, and, as a result of its longstanding history of extreme brutality, has also earned universal condemnation from the United States and the international community:[13]

a)    In 1997, ELN was designated by the United States as a Foreign Terrorist Organization;

b)    In 2001, ELN was designated by the United States as a Specially Designated Global Terrorist;

c)    The European Union has designated and sanctioned the ELN as a terrorist organization for its breaches of international humanitarian law.

42.    As part of its campaign of terror, ELN strategically targets high profile Colombian citizens, such as politicians and businessmen, using tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia while also silencing those adverse to ELN's violent agenda.

43.    In order to finance its terrorist objectives, ELN engages in narcotics manufacturing and trafficking as the primary means of funding its terrorist activities.

---

[11] U.S. Dept. of State, Bureau of International Narcotics and Law Enforcement Affairs, "2012 International Narcotics Control Strategy Report: Country Reports: Colombia," http://www.state.gov/j/inl/narc/rewards/115352.htm.

[12] CRS Report for Congress: "U.S. Military Operations in the Global War on Terrorism: Afghanistan, Africa, the Philippines, and Colombia," Aug. 26, 2005, available at, http://www.fas.org/sgp/crs/natsec/RL32758.pdf

[13] U.S. Dept. of State, Bureau of International Narcotics and Law Enforcement Affairs, "2012 International Narcotics Control Strategy Report: Country Reports: Colombia," http://www.state.gov/j/inl/narc/rewards/115352.htm.

44.     Similarly to FARC, ELN maintains considerable control of areas with significant coca and opium poppy cultivation. [14]

45.     ELN has been affirmatively linked to other narco-terrorist organizations.[15]

46.     At all times relevant to this Complaint, such organizations have been involved in narcotics production and trafficking in partnership with ELN.

47.     South Florida is a principal arrival zone and distribution center for powder cocaine and South American heroin.[16]

48.     Florida is a primary point of entry and target market for Colombia's cocaine trafficking, including narcotics produced and trafficked by ELN.[17]

49.     The ELN and FARC are the two predominant rebel groups actively engaged against the Colombian government in a decades-long civil war, which has been ongoing since about 1964.

50.     The ELN has actively, widely, and systematically targeted civilians during its ongoing military conflicts with the Colombian government.

51.     The ELN is a self-controlled, highly-organized, independent entity that engages in formal relations and negotiations with other entities, including with the Colombian government.

---

[14] United States Dept. of State, Bureau of International Narcotics and Law Enforcement Affairs," 2012 International Narcotics Control Strategy Report: Country Reports: Colombia," August 29, 2012, http://www.state.gov/j/inl/rls/nrcrpt/2012/vol1/184098.htm.

[15] Eduardo Fox, Colombia Dismantles ELN-Rastrojos Drug Trafficking Network, In Sight Crime, Aug. 15, 2012, available at, http://www.insightcrime.org/news-analysis/colombia-eln-rastrojos-drug-trafficking

[16] U.S. Dept. of Justice, National Drug Intelligence Ctr., Abstract, "South Florida High Intensity Drug Trafficking Area: Drug Market Analysis 2012," http://www.state.gov/j/inl/rls/nrcrpt/2012/vol1/184098.htm#Colombia.

[17] See South Florida High Intensity Drug Trafficking Area: Drug Market Analysis 2011, U.S. Department of Justice National Drug Intelligence Center,   p. 10, available at, http://www.justice.gov/archive/ndic/dmas/South_Florida_DMA-2011(U).pdf

## The Norte De Valle Narco-Trafficking Terrorist Organization

52.     The Norte Del Valle Cartel ("NDVC") was at all relevant times a narcotics trafficking organization that engaged in terrorist activities.[18]

53.     The NDVC controlled and operated its base from the southwestern sections of the rural parts of Colombia. In these areas, the NDVC cultivated coca, and operated processing factories by which raw coca and other products were processed into cocaine for export, primarily into US markets.

54.     Much of the coca processed by the NDVC factories was cultivated in rural lands in the southern areas of Colombia, lands that were under the control of the FARC and ELN. Additionally, the NDVC relied upon the FARC and ELN to supply it with cement, product necessary for NDVC's processing of cocaine which was of restricted availability in Colombia but which the FARC obtained in Venezuela and shipped to NDVC processing plants in southern Colombia.

55.     The NDVC exported its illicit product through ports along the Colombian coasts, including the ports of Barranquilla and Santa Marta on the Caribbean coast of Colombia. To move their illicit product from their processing areas to these Caribbean ports and on to the United States, the product was moved along routes through storage areas and clandestine airstrips up through the central regions areas of Colombia, including through the Magdalena District, where the Plaintiff and the Victim owned and operated farms and other properties.

56.     The NDVC aided and abetted and conspired with FARC and ELN by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from

---

[18] *See* United States Department of Treasury website ;2007 Impact Report on Economic Sanctions Against Colombian Drug Cartels available at http://www.treasury.gov/resource-center/sanctions/Documents/narco_impact_report_05042007.pdf; United States Department of Treasury Norte Del Valle Cartel organizational charts, available at http://www.treasury.gov/resource-center/sanctions/Programs/Pages/narco.aspx.

areas of production in southern Colombia and specifically through routes that passed through Plaintiff's and Victim's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its drug distribution and logistical operations, which included removal of political and social opposition such as that presented by the Victim and his family, including Plaintiff. The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and NDVC knew and intended that FARC and ELN would engage in such activities in effecting its directives, including against the Victim and Plaintiff.    NDVC provided FARC and ELN with funds to support these activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine. NDVC knew that the payment of funds to FARC and ELN would provide material support to the FARC and ELN in the commission of such terrorist activities.

57.    NDVC also directly engaged in terrorist activities.   NDVC through its members kidnapped, tortured and assassinated individuals in order to eliminate perceived threats and to intimidate and prevent other persons from cooperating with law enforcement authorities.[19]

58.    NDVC acted through principals and members, who were agencies or instrumentalities of the NDVC, including Carlos Alberto Renteria Mantilla.  A list of these

---

[19] See "Government's Factual Basis in Support of Entry of Guilty Plea" of Diego Montoya Sanchez, case number 99-804-Cr.-Altonaga (S.D. Fla. August 4, 2009) setting forth facts describing how Montoya and members of his organization, which were part of the North Valle Cartel, kidnapped, tortured, and beat Garcia Giraldo to death with baseball bats until he died. The document also describes how his organization used violence and murder to extract information from, threaten, and punish individuals suspected of providing information to or cooperating with authorities or otherwise posing a threat to the organization, and to prevent others from doing so. Montoya is a Specially Designated Narcotics Trafficker by OFAC.

persons identified as being principals and members by the Office of Foreign Assets Control of

the United States Treasury Department ("OFAC") is attached as **Exhibit A** hereto.

## Defendants' Terrorist Activity Targets Plaintiff's Family

59.     At all times relevant to this Complaint, the Victim was a resident and citizen of

Colombia.

60.     The Victim was the father of ten children and the grandfather of eighteen

grandchildren.

61.     The Victim was a member and former president of the Partido Liberal

Colombiano (Colombian Liberal Party) and had been a Senator in Colombia from 1958-1962,

1962-1966, 1970-1974, 1974-1976, and 1986-1990.

62.     On or about 1973, the Victim served as a Colombian Ambassador to the United

Nations.

63.     The Victim was politically active in speaking out against Colombian narcotics

traffickers, including both FARC and ELN.

64.     Several members of the Victim's immediate and extended family, including

Plaintiff, were also actively involved with the Colombian Liberal Party in Colombia. The

Caballero family was known in the area as active advocates against FARC and ELN.

65.     The Victim's brother, Jose "Pepe" Caballero, was the governor of Magdalena

from 1980-1982.

66.     Prior to the Victim's kidnapping, FARC issued a bulletin which was distributed

throughout Magdalena ("Bulletin"), the province where the Victim was eventually kidnapped.

FARC's Bulletin directly threatened the Plaintiff's family and accused them of being an enemy

and a threat to FARC's interests. The Bulletin also called FARC members to arms in order to attack those claimed by FARC to be responsible for the injustices in and about Magdalena.

67.    While traveling to Pivijay, Magdalena, the Victim was abducted by ELN forces.

68.    At the time of his abduction, the Victim was 76 years old and suffered from hypertension and pre-diabetes, among other things.

69.    The Victim remained in the custody of FARC and ELN forces who were working in conjunction to conspire and profit from kidnapping the Victim.

70.    At the time of the Victim's kidnapping, Plaintiff, the Victim's son, was living in Barranquilla, Colombia.

71.    Plaintiff was the owner of a successful rice and husbandry business, "La Espiga," for over 9 years. He also oversaw operations of the Victim's properties and farms, including Hacienda El Ecuador, Hacienda Ginebra, and Finca Telegrafia.

72.    The Victim was unlawfully detained and held captive for 184 days, over 6 months.

73.    Throughout the 184 days of the Victim's captivity, FARC and ELN forces tortured the Victim daily by, among other horrific acts:

    a)    Forcing the Victim to walk through the woods and jungle for hours;

    b)    Depriving the Victim of food and water to the point where the Victim became severely malnourished and emaciated;

    c)    Depriving the Victim of necessary medication that his family had delivered to the FARC and/or ELN, including hypertension medication, and pre-diabetes medication;

d)      Forcing the Victim to spend his entire six-month captivity in caves — with minimal clothing — exposed to the cold, wet, and humid conditions of the Sierra Nevada jungle; and,

e)      Subjecting the Victim to near-constant emotional and verbal abuse, including death threats.

74.      Throughout his captivity, the Plaintiff's family was contacted regularly by Defendants in an ongoing effort to compel them to pay a ransom for the Victim's safety and freedom. FARC and ELN forces demanded six million dollars ($6 Million) to secure the Victim's safety and release.

75.      The Colombian government froze the assets of the Plaintiff's family upon hearing of the Victim's kidnapping.

76.      Shortly before Defendants assassinated the Victim, Plaintiff was urgently warned by the Police Commander of the Anti-Sequestering Task Force that he should flee the country as they would be unable to protect him from Defendants.

77.      Fearing for his life from the threat from Defendants, and upon the urging of the Police Commander of the Anti-Sequestering Task Force, Plaintiff was forced to flee Colombia and, in so doing, deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

78.      Plaintiff fled Colombia for the United States, where he sought and received political asylum.

79.      Tragically, after six months of captivity and torture, Defendants assassinated the Victim by shooting him multiple times.

80.     On August 15, 1999, the Victim's emaciated body was found discarded on a dirt road between the provinces of Magdalena and Cesar and brought to Valledupar, Cesar, where his body was eventually identified and confirmed as the Victim.

81.     At all times relevant to this Complaint, Defendants and others, acted directly and in concert through aiding and abetting and a conspiracy, to effect the kidnapping, unlawful detention, hostage-taking, trafficking, torture, and killing of the Victim.

82.     The Victim was targeted because of his political affiliations, official anti-narcotics positions, and as a source of potential ransom funds to finance the Defendants' terrorist activities and criminal enterprises, including the Defendants' extensive narco-trafficking operations. Additionally, the Victim's properties contained roads and paths through which processed drugs manufactured by the NDVC with product and chemicals supplied by FARC and ELN were transported through and that were used to facilitate drug trafficking logistics and transportation from production and cultivation centers in the southern areas of Colombia to ports on the Caribbean coast of Colombia and on to the United States.

83.     The NDVC aided and abetted and conspired with FARC and ELN by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from areas of production in southern Colombia and specifically through routes that passed through Plaintiff's and Victim's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its drug distribution and logistical operations, which included removal of political and social opposition such as that presented by the Victim and his family, including Plaintiff. The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as

tools to instill fear into the people of Colombia, and NDVC knew and intended that FARC and ELN would engage in such activities in effecting its directives, including against the Victim and Plaintiff. NDVC provided FARC and ELN with funds to support these activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine. NDVC knew that the payment of funds to FARC and ELN would provide material support to the FARC and ELN in the commission of such terrorist activities.

84.    The kidnapping of the Victim, threats to murder him for the purposes of compelling Plaintiff to pay a ransom and to stop the opposition to the Defendants' illegal activities and vacate the properties, and the assassination of the Victim, and the Defendants' conspiracy to do these acts were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

85.    Because of the threat from Defendants' continuing activities and tactics, Plaintiff continues to suffer repeated injuries, including without limitation, economic losses, separation from family, and being forced to continue to live in exile.

86.    Because of the threat from Defendants' continuing activities and tactics, Plaintiff has suffered and continues to suffer emotional, psychological, and economic damages as a result of the Victim's kidnapping, torture, and murder, and the threat from the Defendants which forced him to flee his homeland and seek political asylum and refuge in the United States and forces him to remain in exile to this day. As a result, Plaintiff has suffered and continues to suffer economic and financial damages from the Defendants' terrorist activities, due to the forced abandonment and exile, and the devaluation and loss of the Plaintiff's and Victim's farms,

ranches, other properties, and other businesses, including "La Espiga," causing loss of revenue,

profit, property and livelihood.

87.    Holding Defendants accountable would help deter future political assassinations.

88.    Holding Defendants accountable would help deter future retaliation by terrorists

against unsympathetic Colombian politicians.

89.    Holding Defendants accountable would help deter future kidnapping, human

trafficking, and hostage-taking as means to fund the Defendants' terrorist activities and criminal

enterprises.

## COUNT I
## DEFENDANTS' VIOLATION OF THE ALIEN TORT STATUTE:
## FALSE IMPRISONMENT AND HOSTAGE-TAKING
### (in violation of Federal Law)

90.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth

herein.

91.    The ATS recognizes federal common law causes of action for claims by aliens

suing in tort for violations of the law of nations. "To state a claim for relief under the ATS, a

plaintiff must (1) be an alien (2) suing for a tort (3) committed in violation of the law of nations."

*Mamani v. Berzaín*, 654 F.3d 1148, 1152-53 (11th Cir. 2011).

92.    According to the United States Court of Appeals for the Eleventh Circuit:

For a violation of international law to be actionable under the ATS, the offense
must be based on present day, very widely accepted interpretations of
international law: the specific things the defendant is alleged to have done must
violate what the law already clearly is …. To determine whether the applicable
international law is sufficiently definite, we look to the context of the case before
us and ask whether established international law had already defined defendants'
conduct as wrongful in that specific context.

*Id.,* at 1152 (*citing Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).

93.     Defendants' actions as described herein constitute "hostage-taking" in violation of the law of nations as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

94.     Hostage-taking is a well-recognized violation of international law and is of international mutual concern among nations. Norms against hostage-taking are universal, obligatory, and specific. *Xuncax*, 866 F. Supp. at 184 (holding that plaintiffs' claims for arbitrary detention "constitute fully recognized violations of international law."); *Forti v. Suarez-Mason*, 672 F. Supp. 1531 (N.D. Cal. 1987) (holding that there is "sufficient consensus to evince a customary international human rights norm against arbitrary detention").

95.     In *Sosa*, the Court determined that "a single illegal detention of less than a day . . . violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Sosa*, 542 U.S. at 737.

96.     Hostage-taking was codified as a well-recognized violation of international law by the International Convention Against the Taking of Hostages, G.A. Res. 146 (XXXIV) GAOR, 34th Sess., Supp. No. 46, at 245, U.N. Doc. A/34/36 (1979), entered into force June 3, 1983.[20] The preamble to this convention confirms:

> [t]he taking of hostages is an offence of grave concern to the international community and that, in accordance with the provisions of this Convention, any person committing an act of hostage taking shall either be prosecuted or extradited.

---

[20] International Convention Against the Taking of Hostages, G.A. Res. 146 (XXXIV) GAOR, 34th Sess., Supp. No. 46, at 245, U.N. Doc. A/34/36 (1979), available at, http://www1.umn.edu/humanrts/instree/taking hostages. html (last visited Dec. 7, 2012).

97.     The International Convention Against the Taking of Hostages recognizes that the

offense of hostage-taking is of international character and of grave mutual concern whether the

perpetrators or victims are individuals or states.  Specifically, it provides:

> Any person who seizes or detains and threatens to kill, to injure or to continue to
> detain another person (hereinafter referred to as the "hostage") in order to compel
> a third party, namely a State, an international intergovernmental organization, a
> natural or juridical person, or a group of persons, to do or abstain from doing any
> act as an explicit or implicit condition for the release of the hostage commits the
> offence of taking of hostages ("hostage-taking") within the meaning of this
> Convention.

98.     The United States District Court for the Southern District of Florida has also

recognized an ATS cause of action for false imprisonment on numerous occasions.  *See Eastman

Kodak Co. v. Kavlin*, 978 F. Supp. 1078 (S.D. Fla. 1997) (finding that the law of nations

prohibits a state to use its coercive power to detain an individual in inhumane conditions for a

substantial period of time for the purpose of extorting favorable economic settlement); *Paul v.

Avril*, 901 F. Supp. 330 (S.D. Fla. 1994) (finding damages to be appropriate under the ATS as a

result of Plaintiffs being held captive and tortured by Haiti's military ruler); *But see Aldana v.

Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1247 (11th Cir. 2005) (holding arbitrary

detention  did not constitute a action under ATS because of the short duration of the arbitrary

detention).

99.     Here, the Defendants, directly and acting in concert through aiding and abetting

and a conspiracy, kidnapped, unlawfully detained, and held the Victim hostage for a period of

over 184 days.

100.    Defendants' acts of kidnapping, unlawful detaining, and holding the Victim

hostage  violated widely-accepted, present-day international law and therefore satisfy the

Supreme Court standard, as enunciated by the Eleventh Circuit, that "the offense must be based

on present day, very widely accepted interpretations of international law." *See Mamani,* 654 F.3d at 1152 (11th Cir. 2011) (*citing Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004)).

101.    These acts were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

102.    The NDVC aided and abetted and conspired with FARC and ELN in false imprisonment and hostage taking of the Victim by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from areas of production in southern Colombia and specifically through routes that passed through Plaintiff's and Victim's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its drug distribution and logistical operations, which included removal of political and social opposition such as that presented by the Victim and his family, including Plaintiff.  The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and NDVC knew and intended that FARC and ELN would engage in such activities in effecting its directives, including against the Victim and Plaintiff. NDVC provided FARC and ELN with funds to support these activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine.  NDVC knew that the payment of funds to FARC and ELN would provide material support to the FARC and ELN in the commission of such terrorist activities.

103.    Pursuant to the laws of Colombia, Plaintiff is a legal beneficiary of the Victim.[21]

Consequently, Plaintiff has standing to bring a claim under the ATS. *See, e.g. Baloco*, 640 F.3d

at 1349 (Colombian children had standing to bring wrongful death claim for their father's death

under Colombian law); *Estate of Cabello*, 157 F. Supp. 2d at 1357-58 (finding that even though

Florida law would deny standing to some plaintiffs, they still had standing under the ATS

because they had standing under Chilean law); *see also Xuncax*, 886 F. Supp. at 178 (finding

standing under the ATS based on laws of Guatemala, which allowed siblings to sue for wrongful

death).

104.    As a direct and proximate result of Defendants' acts of false imprisonment and

hostage taking of the Victim, Plaintiff suffered emotional, psychological, and economic

damages, and was forced to flee Colombia and, in so doing, was deprived of his Colombian

properties and business, including "La Espiga," causing loss of revenue, profit, property and

livelihood.

105.    The Defendants' conduct has caused damage to Plaintiff.

106.    WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor

against Defendants, jointly and severally, for damages, prejudgment and post-judgment interest,

attorney fees and costs, and any additional relief this Court may deem appropriate.

---

[21] Under Colombian law, violations of Colombian Criminal Code (Article 103, Article 168, Article 169) entitle Plaintiff to moral and material damages as stipulated by Article 1045 of the Colombian Civil Code, Article 95 of the Colombian Criminal Code, and Act 975 of 2005.

## COUNT II
### DEFENDANTS' VIOLATION OF THE ALIEN TORT STATUTE:
### TRAFFICKING IN PERSONS
### (in violation of Federal Law)

107.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

108.    Article 3, paragraph (a) of the United Nations' "Protocol to Prevent, Suppress and Punish Trafficking in Persons" defines Trafficking in Persons as:

> the recruitment, transportation, transfer, harbouring or receipt of persons, by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation.[22]

109.    Defendants, directly and acting in concert through aiding and abetting and a conspiracy, violated international laws against trafficking in persons by arranging to kidnap, unlawfully detain, and transfer custody of the Victim between both the FARC and ELN.

110.    Defendants, directly and acting in concert through aiding and abetting and a conspiracy, kidnapped, unlawfully detained the Victim for purposes of exploiting the Victim for Defendants' mutual financial and political gain - by holding the Victim for ransom and by targeting a political civilian as part of the Defendants' ongoing campaign of terror against Colombia and its citizens.

111.    The NDVC aided and abetted and conspired with FARC and ELN in trafficking in persons of the Victim by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from areas of production in southern Colombia and specifically through routes that passed through Plaintiff's and Victim's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its

_____

[22] Sept. 20, 2012, http://www.unodc.org/unodc/en/treaties/CTOC/index.html.

drug distribution and logistical operations, which included removal of political and social opposition such as that presented by the Victim and his family, including Plaintiff. The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and NDVC knew and intended that FARC and ELN would engage in such activities in effecting its directives, including against the Victim and Plaintiff. NDVC provided FARC and ELN with funds to support these activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine. NDVC knew that the payment of funds to FARC and ELN would provide material support to the FARC and ELN in the commission of such terrorist activities.

112.    The acts of trafficking in persons described herein constitute a violation of the law of nations as reflected, expressed, defined, and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities including, among others, the United Nations' Protocol to Prevent, Suppress and Punish Trafficking in Persons.

113.    As such, trafficking in persons is a well-recognized violation of international law and is of international mutual concern among nations. Norms against trafficking in persons are universal, obligatory, and specific.

114.    These acts were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

115.    The United States District Court for the Southern District of Florida has recognized that trafficking in persons is a well-established violation of international law.

*Rodriguez Licea v. Curacao Drydock Co.*, 584 F. Supp. 2d 1355, 1358 (S.D. Fla. 2008) (holding, that the "international human trafficking alleged and proved in this matter clearly constitute violations of universal and obligatory norms of international law, thereby constituting actionable claims falling well within the jurisdictional grant of the ATS.").

116.    Defendants' acts of trafficking in persons violate widely-accepted, present-day international law and therefore satisfy the Supreme Court standard, as enunciated by the Eleventh Circuit, that "the offense must be based on present day, very widely accepted interpretations of international law." *See Mamani*, 654 F.3d at 1152 (11th Cir. 2011) (*citing Sosa v. Alvarez-Machain,* 542 U.S. 692 (2004)).

117.    As a direct and proximate result of Defendants' acts of human trafficking, Plaintiff suffered emotional, psychological, and economic damages, and was forced to flee Colombia and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

118.    The Defendants' conduct has caused damage to Plaintiff.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally, for damages, prejudgment and post-judgment interest, attorney fees and costs, and any additional relief this Court may deem appropriate.

## COUNT III
## DEFENDANTS' VIOLATION OF THE ALIEN TORT STATUTE:
## TORTURE DURING COURSE OF WAR CRIMES
### (in violation of Federal Law)

119.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

120.    In violation of international law, for a period of 184 days, the Defendants, directly

and acting in concert through aiding and abetting and a conspiracy, continually tortured the

Victim daily by, among other things:

        a)    Forcing the Victim to walk through the woods and jungle for hours;

        b)    Depriving the Victim of food and water to the point where the Victim

became severely malnourished and emaciated;

        c)    Depriving the Victim of necessary medication, including hypertension

medication and pre-diabetes medication;

        d)    Forcing the Victim to spend his entire six-month captivity in caves — with

minimal clothing — exposed to the cold, wet, and humid conditions of the Sierra Nevada jungle;

and,

        e)    Subjecting the Victim to near-constant emotional and verbal abuse,

including death threats.

121.    For the purposes of the ATS, the United States Court of Appeals for the Eleventh

Circuit has:

> … adopted the definition of torture set forth by the Convention Against Torture
> and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res.
> 39/46, U.N. GAOR, U.N. Doc. A/39/51 (1984).  This convention defines torture
> as the intentional infliction of severe pain or suffering, whether physical or
> mental, on a person for the purposes of obtaining information or a confession,
> punishment, intimidation or coercion, or discrimination.

*In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301, 1324 (S.D. Fla. 2011) (*citing Aldana v.*

*Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1252 (11th Cir. 2005)).

122.    The prohibition against torture is *jus cogens* and has long been a part of

customary international law as reflected, expressed, defined and codified in multilateral treaties

and other international instruments, international and domestic judicial decisions, and other

authorities, including, among others, the United Nations' Universal Declaration of Human Rights.

123.    As such, torture is a well-recognized violation of international law and is of international mutual concern among nations. Norms against torture are universal, obligatory, and specific.

124.    The United States Court of Appeals for the Eleventh Circuit has recognized that, "torture, crimes against humanity, and cruel, inhumane, or degrading punishment have ["long"] been a part of the United States and international law." *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1154 (11th Cir. 2005).

125.    The Eleventh Circuit has provided clear precedence as to an exception to the general rule requiring state action for torture claims brought under the ATS. Specifically, the Eleventh Circuit held that, "[s]ome acts, such as torture and murder committed in the course of war crimes, violate the law of nations regardless of whether the perpetrator acted under color of law of a foreign nation or only as a private individual." *Sinaltrainal v. Coca Cola Co.,* 578 F.3d 1252, 1263 (11th Cir. 2009), *abrogated on other grounds*, *Mohamad v. Palestinian Auth.*, 132 S. Ct. 1702, 1706 (2012) (*citing Kadic v. Karadzic,* 70 F.3d 232, 243 (2d Cir. 1995); *see also Romero v. Drummond Co.,* 552 F.3d 1303, 1316 (11th Cir. 2008) (holding that, "[u]nder the Alien Tort Statute, state actors are the main objects of the law of nations, but individuals may be liable, under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under color of law of a foreign nation.").[23]

---

[23] The general rule followed by most courts is that for torture to be a cognizable claim under the ATS it must arise from state action and/or take place under the color of law. *Aldana v. Del Monte Fresh Produce, N.A., Inc.,* 415 F.3d 1242, 1247 (11th Circ. 2005) (holding that, "state –sponsored torture, unlike torture by private actors, is actionable under the Alien Tort Act."); *Kadic v. Karadzic,* 70 F.3d 232, 243 (2d Cir. 1995) (finding torture claim to be appropriate under ATS, only when committed by state actors or under the color of law).

126. Defendants' acts of torture intentionally inflicted severe and extreme physical and mental pain and suffering to the Victim and mental pain and suffering to the Victim's family, including Plaintiff.

127. Defendants' acts of torture were inflicted deliberately and intentionally for purposes that included, among others, punishing the Victim and Plaintiff, humiliating the Victim, causing the Victim and Plaintiff physical, psychological, emotional, and economic harm, and intimidating both the local Colombian residents and Plaintiff's family, from whom the Defendants sought to coerce ransom money, and use of their properties to facilitate Defendants' narco-terrorist activities.

128. As a result, the Defendants' act of torture is actionable under the ATS, provided pursuant to the war crimes exception.

129. The NDVC aided and abetted and conspired with FARC and ELN in torture of the Victim by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from areas of production in southern Colombia and specifically through routes that passed through Plaintiff's and Victim's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its drug distribution and logistical operations, which included removal of political and social opposition such as that presented by the Victim and his family, including Plaintiff. The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and NDVC knew and intended that FARC and ELN would engage in such activities in effecting its directives, including against the Victim and Plaintiff. NDVC provided FARC and ELN with

funds to support these activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine.  NDVC knew that the payment of funds to FARC and ELN would provide material support to the FARC and ELN in the commission of such terrorist activities.

130.    According to the United States District Court for the Southern District of Florida, war crimes are actionable under the ATS where "(1) there was an armed conflict, (2) the [Defendant] was a party to the conflict, (3) Plaintiffs' relatives were not active participants in the conflict, and (4) Plaintiffs' relatives were tortured or killed in the course of hostilities." *In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d at 1331 (*citing Kadic,* 70 F.3d at 243 (applying the war crimes definition from Common Article 3 of the Geneva Convention)).

131.    Here, the Defendants FARC and ELN are parties to the ongoing Colombian civil war.  In fact, the Southern District of Florida has already held that this particular civil war in Colombia satisfies the first two requirements of a war crime claim. *See John Doe 1, et. al. v. Chiquita Brands International, Inc.,* Docket No. 08-01916, Order Denying Chiquita's Motion to Dismiss (95 pages) (June 3, 2011).

132.    The Victim was not an active participant in the conflict, but was tortured and killed in the course of hostilities by Defendants as they continued to wage an ongoing war against the Colombian military.

133.    Furthermore, the Defendants' death threats, torture, kidnapping, and extortion attempts reflect part of a much larger military strategy, in the context of ongoing civil war, wherein the Defendants seek to identify, target, and eliminate Colombian citizens, such as the Victim, with interests adverse to their cause.

134.    Rather than being a backdrop to the acts of torture referenced herein, the Colombian civil war provided the Defendants motivation and purpose for the torture of the Victim described herein.

135.    In fact, the widespread targeting of Colombian civilians by FARC and ELN is itself a war crime as "the widespread or systematic attack against civilian populations" is a crime against humanity in violation of international law. *Estate of Amergi v. Palestinian Auth.*, 611 F.3d 1350, 1361 (11th Cir. 2010) (*citing Cabello*, 402 F.3d at 1161).

136.    Therefore, FARC and ELN's torture of the Victim, directly and acting in concert through aiding and abetting and a conspiracy with the NDVC, is actionable under the ATS as a war crime occurring to further the purposes of a war conflict.

137.    Defendants' acts of continuous torture of the Victim violate widely-accepted, present-day international law and therefore satisfy the Supreme Court standard, as enunciated by the Eleventh Circuit, that "the offense must be based on present day, very widely accepted interpretations of international law." *See Mamani*, 654 F.3d at 1152 (11th Cir. 2011) (*citing Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).

138.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

139.    As a direct and proximate result of Defendants' acts of torture, Plaintiff suffered emotional, psychological, and economic damages, and was forced to flee Colombia and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

140.    The Defendants' conduct has caused damage to Plaintiff.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally, for damages, prejudgment and post-judgment interest, attorney fees and costs, and any additional relief this Court may deem appropriate.

## COUNT IV
## DEFENDANTS' VIOLATION OF THE ALIEN TORT STATUTE: EXTRAJUDICIAL KILLING DURING COURSE OF WAR CRIMES
### (in violation of Federal Law)

141.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

142.    In violation of international law, the Defendants, directly and acting in concert through aiding and abetting and a conspiracy, assassinated the Victim in the course of an armed conflict. Defendants' actions described herein constituted an extrajudicial killing in violation of international law.

143.    The act of extrajudicial killing described herein constitutes a violation of the law of nations as reflected, expressed, defined and codified in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, including, among others, the United Nations' International Covenant on Civil and Political Rights, the Geneva Convention, and the Hague Convention.

144.    Extrajudicial killing is a well-recognized violation of international law and is of international mutual concern among nations. Norms against extrajudicial killing are universal, obligatory, and specific.

145.    The Eleventh Circuit has provided clear precedence as to an exception to the general rule requiring state action for extrajudicial killing claims brought under the ATS. Specifically, the Eleventh Circuit held that, "[s]ome acts, such as torture and murder committed

in the course of war crimes, violate the law of nations regardless of whether the perpetrator acted under color of law of a foreign nation or only as a private individual." *Sinaltrainal*, 578 F.3d at 1263 (*citing Kadic*, 70 F.3d at 243); *see also Romero*, 552 F.3d at 1316 (holding that, "[u]nder the Alien Tort Statute, state actors are the main objects of the law of nations, but individuals may be liable, under the law of nations, for some conduct, such as war crimes, regardless of whether they acted under color of law of a foreign nation.").[24]

146.    In regards to the elements needed to constitute a war crime, the Southern District of Florida has ruled that an actionable war crime under the ATS occurs where, "(1) there was an armed conflict, (2) the [Defendant] was a party to the conflict, (3) Plaintiffs' relatives were not active participants in the conflict, and (4) Plaintiffs' relatives were tortured or killed in the course of hostilities." *In re Chiquita Brands*, 792 F. Supp. 2d at 1331 (*citing Kadic*, 70 F.3d at 243 (applying the war crimes definition from Common Article 3 of the Geneva Convention)).

147.    In the present matter, the Defendants' death threats, executions, torture, kidnapping, and extortion attempts reflected part of a much larger military strategy, in the context of ongoing civil war, in which the Defendants sought to identify, target, and eliminate Colombian citizens, such as the Victim, with interests adverse to their cause.

148.    The NDVC aided and abetted and conspired with FARC and ELN in their extrajudicial killing of the Victim by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from areas of production in southern Colombia and specifically through routes that passed through Plaintiff's and Victim's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its

---

[24] The general rule followed by most courts is that extrajudicial killing claims are not cognizable under the ATS unless they arise from state action and/or under the color of law. *See In re Chiquita Brands Int'l, Inc.*, 792 F. Supp. 2d 1301 (S.D. Fla. 2011); *Sinaltrainal*, 578 F.3d at 1265; *Aldana*, 415 F.3d at 1247; *Kadic*, 70 F.3d at 234; *Doe v. Exxon Mobil Corp.*, 393 F. Supp. 20, 25-26 (D.D.C 2005).

drug distribution and logistical operations, which included removal of political and social opposition such as that presented by the Victim and his family, including Plaintiff. The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and NDVC knew and intended that FARC and ELN would engage in such activities in effecting its directives, including against the Victim and Plaintiff.    NDVC provided FARC and ELN with funds to support these activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine. NDVC knew that the payment of funds to FARC and ELN would provide material support to the FARC and ELN in the commission of such terrorist activities.

149.    In fact, it has been held in the Southern District of Florida that the ongoing civil war in Colombia reflects an armed conflict in which the Defendants are parties. *See John Doe 1, et. al. v. Chiquita Brands International, Inc.*, Docket No. 08-01916, Order Denying Chiquita's Motion to Dismiss (95 pages) (June 3, 2011).

150.    Rather than being a backdrop to the execution of the Victim described herein, the Colombian civil war provides the Defendants' motivation and purpose for strategically targeting and murdering the Victim.

151.    As such, the Defendants' extrajudicial killing of the Victim is actionable under the ATS as a war crime occurring in furtherance of the purposes of the Defendants' as it relates to their involvement in an ongoing military conflict.

152.    Defendants' extrajudicial killing of the Victim violates widely-accepted, present-day international law and therefore satisfy the Supreme Court standard, as enunciated by the

Eleventh Circuit, that "the offense must be based on present day, very widely accepted interpretations of international law." *See Mamani*, 654 F.3d at 1152 (11th Cir. 2011) (*citing Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).

153.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

154.    As a direct and proximate result of Defendants' extrajudicial killing of the Victim, Plaintiff suffered emotional, psychological, and economic damages, and was forced to flee Colombia and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

155.    The Defendants' conduct has caused damage to Plaintiff.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally, for damages and prejudgment and post-judgment interest, attorney fees and costs, and any additional relief this Court may deem appropriate.


## COUNT V
## DEFENDANTS' VIOLATION OF THE ALIEN TORT STATUTE:
## CRIMES AGAINST HUMANITY
### (in Violation of Federal Law)

156.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

157.    Defendants' actions against the Victim, including his kidnapping, unlawful detention, hostage-taking, trafficking, torture, political targeting, and extrajudicial killing of the Victim constitute crimes against humanity.

158.    The crimes against humanity described herein constitute a violation of the law of nations as reflected, expressed, defined and codified in multilateral treaties and other

international instruments, international and domestic judicial decisions, and other authorities, including, among others, the Rome Statute of the International Criminal Court.

159.     Crimes against humanity are well-recognized violations of international law and are of international mutual concern among nations.  Norms against crimes against humanity are universal, obligatory, and specific.

160.     According to the International Criminal Court, murder, torture, imprisonment, and political persecution during a widespread and systematic attack on a civilian population all constitute crimes against humanity in violation of international law.[25]

161.     The United States Court of Appeals for the Eleventh Circuit has confirmed, in numerous cases, that "torture, crimes against humanity, and cruel, inhumane, or degrading punishment have ["long"] been a part of the United States and international law." *Cabello,* 402 F.3d 1148 at 1154.

162.     Other courts have also confirmed that "crimes against humanity" reflect violations of the law of nations. *See Doe v. Saravia*, 348 F. Supp. 2d 1112 (E.D. Cal. 2004); *Sarei v. Rio Tinto, Plc.*, 487 F.3d 1193, 1202 (9th Cir. 2007).

163.     Further, the Southern District Court of Florida specifically confirmed in *In re Chiquita Brands,* that "crimes against humanity" represents an actionable claim under the ATS which survives the cautious approach laid out by the Supreme Court in *Sosa*.  *In re Chiquita Brands,* 792 F. Supp. 2d at 1301 (*citing Sosa*, 542 U.S. at 762) ("Today international law will sometimes similarly reflect not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of

---

[25] Article 7, Rome Statute of the International Criminal Court, available at, http://www.icc-cpi.int/NR/rdonlyres/ADD16852-AEE9-4757-ABE7-9CDC7CF02886/283503/RomeStatutEng1.pdf (last visited Dec. 7, 2012).

that behavior. That subset includes torture, genocide, crimes against humanity, and war crimes.").

164.    Moreover, the widespread targeting of Colombian civilians by Defendants is itself a war crime as "the widespread or systematic attack against civilian populations" is a crime against humanity in violation of international law. *Estate of Amergi*, 611 F.3d at 1361 (*citing Cabello*, 402 F.3d at 1161).

165.    Liability under crimes against humanity claims requires (1) a widespread or systematic attack; (2) directed against any civilian (3) with a nexus between the first two factors and the defendant. *Chiquita Brands*, 792 F. Supp. 2d at 1301.

166.    Defendants' widespread and systematic attack on the civilian population in Colombia implicates foreign relations concerns. First, the ongoing Colombian civil war has implications for international narco-trafficking and narco-terrorism.[26] Second, the widespread and systematic targeting of civilians in Colombia often includes foreign nationals in Colombia—including United States citizens.

167.    Defendants' continued kidnappings, extortion, murder, as well as the other inhumane acts alleged herein constitute crimes against humanity. These acts were committed by Defendants as part of a systematic, widespread campaign of terrorism that has included strategic kidnappings, extortion, and assassinations against Colombian citizens in order to further their needs in an ongoing civil war against Colombia that has endured for over 50 years.

168.    The NDVC aided and abetted and conspired with FARC and ELN in crimes against humanity against the Victim by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from areas of production in southern

---

[26] USAWC Strategy Research Project, United States Army Special Forces Support to "Plan Colombia," April 7, 2003, http://www.dtic.mil/cgi-bin/GetTRDoc?AD=ADA414500.

Colombia and specifically through routes that passed through Plaintiff's and Victim's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its drug distribution and logistical operations, which included removal of political and social opposition such as that presented by the Victim and his family, including Plaintiff. The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and NDVC knew and intended that FARC and ELN would engage in such activities in effecting its directives, including against the Victim and Plaintiff.    NDVC provided FARC and ELN with funds to support these activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine.  NDVC knew that the payment of funds to FARC and ELN would provide material support to the FARC and ELN in the commission of such terrorist activities.

169.    Defendants' crimes against the Victim violate widely-accepted, present-day international law as crimes against humanity and therefore satisfy the Supreme Court standard, as enunciated by the Eleventh Circuit, that "the offense must be based on present day, very widely accepted interpretations of international law." *See Mamani*, 654 F.3d at 1152 (11th Cir. 2011) (*citing Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004)).

170.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

171.    As a direct and proximate result of Defendants' acts against humanity, Plaintiff suffered emotional, psychological, and economic damages, and was forced to flee Colombia and,

in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

172.   The Defendants' conduct has caused damage to Plaintiff.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally, for damages, prejudgment and post-judgment interest, attorney fees and costs, and any additional relief this Court may deem appropriate.


## COUNT VI
## DEFENDANTS' VIOLATION OF CIVIL RICO
## 18 U.S.C. § 1962(a)

173.   Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

174.   18 U.S.C. § 1962(a) provides that:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

175.   Defendants FARC, ELN, and NDVC, in association with other narco-traffickers and terrorists who were not their members but agents,[27] formed an association of terrorists and narcotics producers and traffickers to promote and further their goals and objectives (referred to herein as the "Colombian Narco-Terrorist Association") of profiting from the illicit drug trade. This association is an "enterprise" as defined by 18 U.S.C. § 1961(4) and affected interstate commerce within the United States, Florida, and Colombia.

---

[27] As more specifically set forth in indictments as announced by Attorney General Ashcroft. *See e.g.* http://www.justice.gov/archive/ag/speeches/2002/031802newsconferencefarc.htm; http://www.justice.gov/archive/ag/speeches/2002/043002newsconferencefarcindictment.htm; http://www.justice.gov/archive/ag/speeches/2002/1302finalfarcstatement.htm

176.    The Colombian Narco-Terrorist Association has engaged in a pattern of racketeering activity by, among other things, repeatedly engaging in murder, kidnapping, extortion, felonious manufacture, importation, receiving, concealment, buying, selling and trafficking in cocaine and heroin, trafficking in persons, and money laundering, all of which are related to generating profits on behalf of the members.

177.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

178.    This pattern of racketeering activity amounts to continued criminal activity in Colombia and in the United States and affects interstate commerce.

179.    The Defendants, through the Colombian Narco-Terrorist Association, received money from this pattern of racketeering activity, including receiving money from narcotics production, narcotics trafficking, kidnapping, hostage-taking, trafficking in persons, and extortion, among other things.

180.    Defendants, through the Colombian Narco-Terrorist Association, engaged in a pattern of racketeering when they engaged in the trafficking and torture of the Victim, and when they threatened Plaintiff's life and livelihood.

181.    Defendants used income received from the Colombian Narco-Terrorist Association's racketeering activities in the acquisition and operation of the Colombian Narco-Terrorist Association, including, among other things, by removing the Victim and Plaintiff and their opposition to the Colombian Narco-Terrorist Association's narcotics and terrorist activities, and depriving them of their properties by which the Colombian Narco-Terrorist Association expanded and facilitated its logistical operations, distribution, and trafficking of illicit drugs.

182.    Defendants' activities described herein amount to a violation of 18 U.S.C.
§ 1962(a).

183.    As a direct and proximate cause of Defendants' violation of 18 U.S.C. § 1962(a),
Plaintiff suffered and has continued to suffer economic damages to his business and property,
and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived
of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit,
property and livelihood.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against
Defendants, jointly and severally, for conduct in concert causing indivisible harm to Plaintiff, for
threefold damages, attorney fees, and costs pursuant to 18 U.S.C. § 1964(c), prejudgment and
post-judgment interest, and any additional relief this Court may deem appropriate.

## COUNT VII
## DEFENDANTS' VIOLATION OF CIVIL RICO
## 18 U.S.C. § 1962(b)

184.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth
herein.

185.    18 U.S.C. § 1962(b) provides that:

[i]t shall be unlawful for any person through a pattern of racketeering activity or
through collection of an unlawful debt to acquire or maintain, directly or
indirectly, any interest in or control of any enterprise which is engaged in, or the
activities of which affect, interstate or foreign commerce.

186.    Defendants FARC, ELN, and NDVC, in association with other narco-traffickers
who were not their members but agents,[28] formed the Colombian Narco-Terrorist Association to

---

[28] As more specifically set forth in indictments as announced by Attorney General Ashcroft. *See e.g.*
http://www.justice.gov/archive/ag/speeches/2002/031802newsconferencefarc.htm;

promote and further their goals and objectives of profiting from the illicit drug trade. This association is an "enterprise" as defined by 18 U.S.C. § 1961(4) and affected interstate commerce within the United States, Florida, and Colombia.

187. The Defendants, through the Colombian Narco-Terrorist Association, have engaged in a pattern of racketeering activity by, among other things, engaging in murder, kidnapping, extortion, felonious manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, trafficking in persons, and money laundering, all of which are related to Defendants' ultimate purpose of financing and maintaining an interest in the Colombian Narco-Terrorist Association and towards its ongoing war against Colombia and Colombia's civilian population.

188. These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

189. This pattern of racketeering activity amounts to continued criminal activity in Florida, Colombia and in the United States and affects interstate commerce.

190. The Defendants, through this pattern of racketeering activity, have acquired and maintained an interest in, and control of, the Colombian Narco-Terrorist Association, which is engaged in, and affects, interstate and foreign commerce.

191. The Defendants, through the Colombian Narco-Terrorist Association, engaged in a pattern of racketeering when they engaged in the trafficking and torture of the Victim, and when it threatened Plaintiff's life and livelihood.

192. The Defendants' pattern of racketeering activity was used to acquire and maintain an interest and control of the Colombian Narco-Terrorist Association including operations that,

http://www.justice.gov/archive/ag/speeches/2002/043002newsconferencefarcindictment.htm;
http://www.justice.gov/archive/ag/speeches/2002/1302finalfarcstatement.htm

directly and acting in concert through aiding and abetting and a conspiracy, among other things, removed the Victim and Plaintiff and their opposition to the Colombian Narco-Terrorist Association's narcotics and terrorist activities, by which the Colombian Narco-Terrorist Association expanded and facilitated its logistical operations, distribution, and trafficking of illicit drugs.

193.   Defendants' activities described herein violate 18 U.S.C. § 1962(b).

194.   Plaintiff has been injured by Defendants' control and maintenance of the Colombian Narco-Terrorist Association. *See generally In re Sahlen & Associates, Inc. Sec.Litig.*, 773 F. Supp. 342, 369 (S.D. Fla. 1991).

195.   As a direct and proximate cause of Defendants' control and maintenance of the Colombian Narco-Terrorist Association, in violation of 18 U.S.C. § 1962(b), Plaintiff suffered and has continued to suffer economic damages to his business and property, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

WHEREFOR, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally, for conduct in concert causing indivisible harm to Plaintiff, for threefold damages, attorney fees, and costs pursuant to 18 U.S.C. § 1964(c), prejudgment and post-judgment interest, and any additional relief this Court may deem appropriate.

## COUNT VIII
## DEFEDANTS' VIOLATION OF CIVIL RICO
## 18 U.S.C. § 1962(c)

196. Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth

herein.

197. 18 U.S.C. § 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

198. Defendants FARC, ELN, and NDVC, in association with other narco-traffickers who were not their members but agents,[29] formed the Colombian Narco-Terrorist Association to promote and further their goals and objectives of profiting from the illicit drug trade. This association is an "enterprise" as defined by 18 U.S.C. § 1961(4) and affected interstate commerce within the United States, Florida, and Colombia.

199. Defendants conducted and participated in the affairs of the Colombian Narco-Terrorist Association.

200. The Colombian Narco-Terrorist Association operated as a unit to provide, among other narcotics, 80% of the world's cocaine.

201. The Colombian Narco-Terrorist Association is a vehicle for the commission of murder, kidnapping, extortion, trafficking in persons, the manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, and money laundering.

202. Plaintiff and the Victim were known as active advocates against ELN and FARC.

---

[29] As more specifically set forth in indictments as announced by Attorney General Ashcroft. *See e.g.* http://www.justice.gov/archive/ag/speeches/2002/031802newsconferencefarc.htm;
http://www.justice.gov/archive/ag/speeches/2002/043002newsconferencefarcindictment.htm;
http://www.justice.gov/archive/ag/speeches/2002/1302finalfarcstatement.htm

203.    Defendants conducted and participated in the affairs of the Colombian Narco-Terrorist Association through a pattern of racketeering activity, consisting of, among other things, engaging in murder, kidnapping, trafficking in persons, extortion, threats, the manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, and money laundering, all of which are related to the purpose of expanding drug trafficking activities and profits.

204.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

205.    This pattern of racketeering activity amounts to continued criminal activity in Florida, Colombia and the United States.

206.    The Colombian Narco-Terrorist Association activities included kidnapping, extortion, murder, and threats to the Victim and Plaintiff to deprive Plaintiff and the Victim of their properties.  This was done to facilitate the Colombian Narco-Terrorist Association's drug trafficking activities by expanding the logistics and transportation network through Plaintiff's and the Victim's properties, as well as by removing the opposition of Plaintiff and the Victim to FARC, ELN, NDVC, and the Colombian Narco-Terrorist Association's trafficking and terrorist activities.

207.    Defendants, acting in concert through the Colombian Narco-Terrorist Association, engaged in a pattern of racketeering when they kidnapped, trafficked, tortured, and murdered the Victim, and when they threatened Plaintiff's life and livelihood in order to expand and facilitate their narcotics logistical and distribution networks.

208.    Defendants' activities amount to a violation of 18 U.S.C. § 1962(c).

209.     As a direct and proximate cause of Defendants' violation of 18 U.S.C. § 1962(c),

Plaintiff suffered and has continued to suffer economic damages to his business and property,

and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived

of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit,

property and livelihood.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against

Defendants, jointly and severally, arising from Defendants' violations of 18 U.S.C. § 1962(c),

for threefold damages, attorney fees, and costs pursuant to 18 U.S.C. § 1964(c), prejudgment and

post-judgment interest, and any additional relief this Court may deem appropriate.

## COUNT IX
## DEFENDANTS' VIOLATION OF CIVIL RICO
## 18 U.S.C. § 1962(d)

210.     Plaintiff re-alleges the allegations of paragraphs 1 through 89, and 173 through

209, as if fully set forth herein.

211.     Defendants conspired to violate (1) 18 U.S.C. § 1962(a) by agreeing to receive

income derived from a pattern of racketeering activity and using such income or the proceeds

thereof in the establishment and operation of the Colombian Narco-Terrorist Association.

212.     Defendants conspired to violate (2) 18 U.S.C. § 1962(b) by agreeing to conduct

and conducting a pattern of racketeering activity to acquire or maintain interest in or control of

the Colombian Narco-Terrorist Association.

213.     Defendants FARC, ELN, and NDVC conspired to violate 18 U.S.C. § 1962(c) by

agreeing to associate with the Colombian Narco-Terrorist Association and engaging together to

conduct or participate in the conduct of the Colombian Narco-Terrorist Association's affairs

through a pattern of racketeering, including among other things, engaging in murder, kidnapping, extortion, felonious manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, trafficking in persons, and money laundering, and the kidnapping, trafficking, torture and murder of the Victim, and threatening Plaintiff's life and livelihood.

214.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

215.    This pattern of racketeering activity amounts to continued criminal activity in Florida, Colombia and the United States which affected interstate commerce.

216.    Defendants had knowledge that their intentional acts were part of a pattern of racketeering and agreed to the commission of those acts to further their schemes.

217.    Defendants' conspiracy to violate 18 U.S.C. § 1962 (a)-(c), as described herein, is a violation of 18 U.S.C. § 1962 (d).

218.    As a direct and proximate cause of Defendants' actions in violation of 18 U.S.C. § 1962(d), Plaintiff suffered and has continued to suffer economic damages to his business and property, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally, arising from Defendants' violations of 18 U.S.C. § 1962(d), for threefold damages, attorney fees, and costs pursuant to 18 U.S.C. § 1964(c), as well as prejudgment and post-judgment interest, and any additional relief this Court may deem appropriate.

## COUNT X
## DEFNDANTS' VIOLATION OF FLORIDA CIVIL RICO
## F.S. § 772.103(1)

219.     Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth

herein.

220.     Fla. Stat. § 772.103(1) provides that it is unlawful for any person:

> Who has with criminal intent received any proceeds derived, directly or
> indirectly, from a pattern of criminal activity or through the collection of
> an unlawful debt to use or invest, whether directly or indirectly, any part
> of such proceeds, or the proceeds derived from the investment or use
> thereof, in the acquisition of any title to, or any right, interest, or equity in,
> real property or in the establishment or operation of any enterprise.

221.     Defendants FARC, ELN, and NDVC, in association with other narco-traffickers

who were not their members but agents,[30] formed the Colombian Narco-Terrorist Association to

promote and further their goals and objectives of profiting from the illicit drug trade.   This

association is an enterprise-in-fact within the meaning of Fla. Stat. § 772.102(3) which affects

commerce within Florida, and Colombia.

222.     The Colombian Narco-Terrorist Association has engaged in a pattern of

racketeering activity by, among other things, repeatedly engaging in murder, kidnapping,

extortion, felonious manufacture, importation, receiving, concealment, buying, selling and

trafficking in cocaine and heroin, trafficking in persons, and money laundering, all of which are

related to generating profits on behalf of the members.

223.     This pattern of racketeering activity amounts to continued criminal activity in

Florida, Colombia and in the United States.

---

[30] As more specifically set forth in indictments as announced by Attorney General Ashcroft.  *See e.g.*
http://www.justice.gov/archive/ag/speeches/2002/031802newsconferencefarc.htm;
http://www.justice.gov/archive/ag/speeches/2002/043002newsconferencefarcindictment.htm;
http://www.justice.gov/archive/ag/speeches/2002/1302finalfarcstatement.htm

224.   These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

225.   The Defendants, through the Colombian Narco-Terrorist Association, received money from this pattern of racketeering activity, including receiving money from narcotics production, narcotics trafficking, kidnapping, hostage-taking, trafficking in persons, and extortion, among other things.

226.   Defendants, through the Colombian Narco-Terrorist Association, engaged in a pattern of racketeering when they engaged in the trafficking and torture of the Victim, and when they threatened Plaintiff's life and livelihood.

227.   Defendants used income received from the Colombian Narco-Terrorist Association's racketeering activities in the acquisition and operation of the Colombian Narco-Terrorist Association, including, among other things, by removing the Victim and Plaintiff and their opposition to the Defendants' narcotics and terrorist activities, and depriving them of their properties by which the Colombian Narco-Terrorist Association expanded and facilitated its logistical operations, distribution, and trafficking of illicit drugs.

228.   FARC's activities described herein amount to a violation of Fla. Stat. § 772.103(1).

229.   As a direct and proximate cause of FARC's violation of Fla. Stat. § 772.103(1), Plaintiff suffered and has continued to suffer emotional, psychological, and economic damages, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally for conduct in concert causing indivisible harm to Plaintiff, for threefold damages, attorney fees, and costs pursuant to Fla. Stat. § 772.104(1), prejudgment and post-judgment interest, and any additional relief this Court may deem appropriate.

## COUNT XI
## DEFENDANTS' VIOLATION OF FLORIDA CIVIL RICO
## F.S. § 772.103(2)

230.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

231.    Fla. Stat. § 772.103(2) provides that is unlawful for any person

> through a pattern of criminal activity or through the collection of an unlawful debt, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or real property.

232.    Defendants FARC, ELN, and NDVC, in association with other narco-traffickers who were not their members but agents,[31] formed the Colombian Narco-Terrorist Association to promote and further their goals and objectives of profiting from the illicit drug trade. This association is an "enterprise" within the meaning of Fla. Stat. § 772.102(3) which affects commerce within Florida and Colombia.

233.    The Defendants, through the Colombian Narco-Terrorist Association, have engaged in a pattern of racketeering activity by, among other things, engaging in murder, kidnapping, extortion, felonious manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, trafficking in persons, and money laundering, all of

---

[31] As more specifically set forth in indictments as announced by Attorney General Ashcroft. *See e.g.* http://www.justice.gov/archive/ag/speeches/2002/031802newsconferencefarc.htm; http://www.justice.gov/archive/ag/speeches/2002/043002newsconferencefarcindictment.htm; http://www.justice.gov/archive/ag/speeches/2002/1302finalfarcstatement.htm

which are related to Defendants' ultimate purpose of financing and maintaining an interest in the Colombian Narco-Terrorist Association.

234.    This pattern of racketeering activity amounts to continued criminal activity in Florida, Colombia and the United States.

235.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

236.    The Defendants, through this pattern of racketeering activity, have acquired and maintained an interest in, and control of, the Colombian Narco-Terrorist Association, which is engaged in, and affects, interstate and foreign commerce.

237.    The Defendants, through the Colombian Narco-Terrorist Association, engaged in a pattern of racketeering when they engaged in the trafficking and torture of the Victim, and when it threatened Plaintiff's life and livelihood

238.    The Defendants' pattern of racketeering activity was used to acquire and maintain an interest and control of the Colombian Narco-Terrorist Association including operations that, directly and acting in concert through aiding and abetting and a conspiracy, among other things, removed the Victim and Plaintiff and their opposition to the Colombian Narco-Terrorist Association's narcotics and terrorist activities, and deprived them of their properties by which the Colombian Narco-Terrorist Association expanded and facilitated its logistical operations, distribution, and trafficking of illicit drugs.

239.    The Defendants' activities described herein violate Fla. Stat. § 772.103(2).

240.    Plaintiff has been injured by Defendants' control and maintenance of the Colombian Narco-Terrorist Association.

241.    As a direct and proximate cause of Defendants' control and maintenance of the

Colombian Narco-Terrorist Association, in violation of 18 Fla. Stat. § 772.103(2), Plaintiff

suffered and has continued to suffer emotional, psychological, and economic damages, and was

forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his

Colombian properties and business, including "La Espiga," causing loss of revenue, profit,

property and livelihood.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against

Defendants, jointly and severally for conduct in concert causing indivisible harm to Plaintiff, for

threefold damages, attorney fees, and costs pursuant to Fla. Stat. § 772.104(1), prejudgment and

post-judgment interest, and any additional relief this Court may deem appropriate.

## COUNT XII
## DEFENDANTS' VIOLATION OF FLORIDA CIVIL RICO
## F.S. § 772.103(3)

242.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth

herein.

243.    Fla. Stat. § 772.103(3) provides that is unlawful for any person, "[e]mployed by,

or associated with, any enterprise to conduct or participate, directly or indirectly, in such

enterprise through a pattern of criminal activity or the collection of an unlawful debt."

244.    Defendants FARC, ELN, and NDVC, in association with other narco-traffickers

who were not their members but agents,[32] formed the "Colombian Narco-Terrorist Association"

of profiting from the illicit drug trade. This association is an enterprise-in-fact as defined by

---

[32]  As more specifically set forth in indictments as announced by Attorney General Ashcroft. *See e.g.*
http://www.justice.gov/archive/ag/speeches/2002/031802newsconferencefarc.htm;
http://www.justice.gov/archive/ag/speeches/2002/043002newsconferencefarcindictment.htm;
http://www.justice.gov/archive/ag/speeches/2002/1302finalfarcstatement.htm

Florida Statutes § 772.102(3) and affected interstate commerce within the United States, Florida, and Colombia.

245.  Defendants conducted and participated in the affairs of the Colombian Narco-Terrorist Association.

246.  The Colombian Narco-Terrorist Association operates as a unit to provide, among other narcotics, 80% of the world's cocaine.

247.  The Colombian Narco-Terrorist Association is a vehicle for the commission of murder, kidnapping, extortion, trafficking in persons, the manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, and money laundering.

248.  Plaintiff and the Victim were known as active advocates against ELN and FARC.

249.  Defendants conducted and participated in the affairs of the Colombian Narco-Terrorist Association through a pattern of racketeering activity, consisting of, among other things, engaging in murder, kidnapping, trafficking in persons, extortion, threats, the manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, and money laundering, all of which are related to the purpose of expanding drug trafficking activities and profits to finance Defendants' ongoing war against Colombia and Colombia's civilian population.

250.  The Colombian Narco-Terrorist Association activities included kidnapping, extortion, murder, and threats to the Victim and Plaintiff to deprive Plaintiff and the Victim of their properties. This was done to facilitate the Colombian Narco-Terrorist Association's drug trafficking activities by expanding the logistics and transportation network through Plaintiff's and the Victim's properties, as well as by removing the opposition of Plaintiff and the Victim to

FARC, ELN, NDVC, and the Colombian Narco-Terrorist Association's trafficking and terrorist activities.

251.    Defendants, acting in concert through the Colombian Narco-Terrorist Association engaged in a pattern of racketeering when they kidnapped, trafficked, tortured, and murdered the Victim, and when they threatened Plaintiff's life and livelihood in order to expand and facilitate their narcotics logistical and distribution networks.

252.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

253.    Defendants' activities amount to a violation of Fla. Stat. § 772.103(3).

254.    As a direct and proximate cause of Defendants violation of Fla. Stat. § 772.103(3), Plaintiff suffered and has continued to suffer emotional, psychological, and economic damages, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally, arising from Defendants' violations of Fla. Stat. § 772.103(3), for threefold damages, attorney fees, and costs pursuant to Fla. Stat. § 772.104(1), as well as prejudgment and post-judgment interest, and any additional relief this Court may deem appropriate.

## COUNT XIII
## DEFENDANTS' VIOLATION OF FLORIDA CIVIL RICO
## F.S. § 772.103(4)

255.    Plaintiff re-alleges the allegations of paragraphs 1 through 89, and 219 through 254 as if fully set forth herein.

256.    Fla. Stat. § 772.103(4) provides that it is unlawful for any person "To conspire or endeavor to violate any of the provisions of subsection (1), subsection (2), or subsection (3)."

257.    Defendants conspired to violate Fla. Stat. § 772.103(1) by receiving income derived from a pattern of racketeering activity and using such income or the proceeds thereof in the establishment and operation of the Colombian Narco-Terrorist Association.

258.    Defendants conspired to violate Fla. Stat. § 772.103(2) by agreeing to conduct and conducting a pattern of racketeering activity to acquire or maintain interest in or control of the NDVC.

259.    Defendants FARC, ELN, and NDVC conspired to violate Fla. Stat. § 772.103(3) by agreeing to associate with the Colombian Narco-Terrorist Association and engaging together to conduct or participate in the conduct of the Colombian Narco-Terrorist Association's affairs through a pattern of racketeering, including among other things, engaging in murder, kidnapping, extortion, felonious manufacture, importation, receiving, concealment, buying, selling, and trafficking in cocaine and heroin, trafficking in persons, and money laundering, and the kidnapping, trafficking, torture and murder of the Victim, and threatening Plaintiff's life and livelihood.

260.    These acts and activities were unlawful under the laws of Colombia where the activities occurred, and constitute acts of terrorism within the meaning of §201(d)(1) of TRIA.

261.    The Colombian Narco-Terrorist Association affected interstate commerce in the United States, specifically commerce in Florida.

262.    Defendants had knowledge that their intentional acts were part of a pattern of racketeering and agreed to the commission of those acts to further their schemes.

263.    Defendants' conspiracy to violate Fla. Stat. §§ 772.103(1)-(3) as described herein is a violation of Fla. Stat. § 772.103(4).

264.    As a direct and proximate cause of Defendants' actions in violation of Fla. Stat. § 772.103(4), Plaintiff suffered and has continued to suffer emotional, psychological, and economic damages, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

265.    WHEREFORE, Plaintiff, Antonio Caballero, demands judgment in his favor against Defendants, jointly and severally, arising out of Defendants' conspiracies to commit violations of Fla. Stat. §§ 772.103(1)-(3), for threefold damages, attorney fees, and costs pursuant to Fla. Stat. § 772.104(1), prejudgment and post-judgment interest, and any additional relief this Court may deem appropriate.

## COUNT XIV
## DEFENDANTS' VIOLATION OF COLOMBIAN LAW
## WRONGFUL DEATH

266.    Plaintiff re-alleges the allegations of paragraphs 1 through 89 as if fully set forth herein.

267.    Under Florida's conflict-of-laws analysis and significant relationship test, Colombia's interest is the most significant because:

a)      Colombia is where the Victim resided at the time of the tort;

b)      Colombia is where the Victim was kidnapped;

c)      Colombia is where the Victim was assassinated by Defendants, directly and acting in concert through aiding and abetting and a conspiracy;

d)      Colombia recognizes a wrongful death cause of action. *Judge v. American Motors Corporation*, 908 F. 2d 1565 (11th Cir. 1990).

268.    Defendants, directly and acting in concert through aiding and abetting and a conspiracy, kidnapped, tortured, and killed the Victim in violation of Colombian law.

269.    The NDVC aided and abetted and conspired with FARC and ELN by specifically directing and commissioning FARC and ELN to transport and safeguard their illicit product from areas of production in southern Colombia and specifically through routes that passed through Plaintiff's and Victim's properties, to ports on Colombia's Caribbean coast (and then on to the United States), and to facilitate and expand its drug distribution and logistical operations, which included removal of political and social opposition such as that presented by the Victim and his family, including Plaintiff. The NDVC knew that FARC and ELN engaged in terrorist activities, such as targeting high profile Colombian citizens including politicians and businessmen, and that they used tactics such as kidnapping, hostage-taking, human trafficking, torture and extortion as tools to instill fear into the people of Colombia, and NDVC knew and intended that FARC and ELN would engage in such activities in effecting its directives, including against the Victim and Plaintiff.   NDVC provided FARC and ELN with funds to support these activities in exchange for FARC and ELN transporting and safeguarding the drugs, and for supplying NDVC with materials needed for producing cocaine.  NDVC knew that the payment of funds to FARC and

ELN would provide material support to the FARC and ELN in the commission of such terrorist activities.

270.    Defendants' actions violated the Colombian Penal Code prohibiting the acts of: (1) kidnapping and extortion (Article 169, Article 170 #2o and #7o, Article 244 #7o); (2) rebellion (Article 187); (3) terrorism (Article 125); and, (4) homicide (Article 323).

271.    Pursuant to Articles 1494, 1613, 1614, 2341, and 2356 of the Colombian Civil Code, Defendants are liable for damages for the wrongful death of the Victim and for the Colombian Penal Code violations of kidnapping, extortion, torture, rebellion, terrorism, and homicide as described in Paragraph 277 herein.

272.    The Victim is survived by several heirs, including Plaintiff, Antonio Caballero.

273.    As an heir of the Victim and as the legal beneficiary under Colombian law, Plaintiff has standing and a substantial right to bring a wrongful death claim against the Victim's murderers. *Baloco*, 640 F.3d 1349.

274.    As a consequence of Defendants' actions of kidnapping and torture against the Victim, Plaintiff suffered and has continued to suffer emotional, psychological, and economic damages, and was forced to flee Colombia and continue to remain in exile and, in so doing, was deprived of his Colombian properties and business, including "La Espiga," causing loss of revenue, profit, property and livelihood.

275.    As a consequence of Defendants' actions including the Victim's kidnapping, torture and the death threats to Plaintiff's family, Plaintiff was forced to flee Colombia in fear of his life.

276.    As a consequence of Defendants' actions, Plaintiff suffered damages to his ranching and rice business, including the complete loss of said businesses.

277.    In addition, the Defendants' conduct described herein has resulted in emotional, psychological, physical, and economic harm to Plaintiff.

WHEREFORE, Plaintiff, Antonio Caballero, individually, and as Carlos Caballero's legal beneficiary, demands judgment in his favor against Defendants, jointly and severally, for damages, interest, attorney fees and costs, and any additional relief this Court may deem appropriate.


DATED this $\mathcal{H}$ day of March, 2013.



                            Respectfully submitted,

                            ZUMPANO PATRICIOS & WINKER, P.A.

                            312 Minorca Avenue
                            Coral Gables, FL 33134
                            Tel:  305-444-5565
                            Fax: 305-444-8588

                            By: _____
                                Joseph I. Zumpano
                                Florida Bar No. 0056091
                                jzumpano@zpwlaw.com
                                Leon N. Patricios
                                Florida Bar No. 0012777
                                lpatricios@zpwlaw.com

# EXHIBIT "A" - Norte Del Valle Cartel Organization List

| Name | Nickname | OFAC Identificaton |
|------|----------|--------------------|
| Abdala Saieh Jassir | | Associate |
| Adriana Lopera Barbosa | | Front Person |
| Adriana Maria Giraldo Hernandez | | Associate (Money Laundering) |
| Aida Salome Grajales Lemos | | Member, Sister of Raul A. Grajales |
| Alejandro Gonzalez Sanclemente | | Front Person |
| Alejandro Valero Jimenez | | Associate |
| Alexander Rios Lozano | | Key Business Associate |
| Alfonso Barrera Rios | | Associate |
| Alfonso Bueno Guerrero | | Key Front Person (Medical) |
| Alfonso Ramirez Valdivieso | | Business Associate |
| Alfonso Ricardo Diaz | | Key Business Associate |
| Alfonso Sanchez Lopez | | Business Associate |
| Alvaro Barrera Marin | | Key Business Associate |
| Alvaro Enrique Barrera Rios | | Key Business Associate |
| Andres Fernando Quintana Fuertes | | Key Front Person (Agro-Industrial) |
| Amparo Fomeque Blanco | | Aunt of Victor Patino |
| Ana Elvia Hernandez Zea | | Business Associate , Sister of Luis Hernandez Zea |
| Antonieta Numa Sanjuan | | Business Associate |
| Arcangel de Jesus Henao Montoya | Mocho | Principal |
| Armando Jacobo Jaar Jacir (Jassir) | | Key Business Associate |
| Augusto Guillermo Yordan Cadenas | | Associate (Money Laundering) |
| Beatriz Eugenia Renteria Caicedo | | "Beto Renteria" Family, Front Company Shareholder |
| Benedicto Quinones | | Associate |
| Bernando A. Marin Tobon | | Key Business Associate |
| Carlos Alberto Curea Correa | Cucu/ La Llaveria | Member |
| Carlos Alberto Gomez Qunitero | | Member |
| Carlos Alberto Renteria Mantilla | Don Beto/ Beto Renteria | Principal |
| Carlos Andres Henao Gonzalez | | Member, Son of Arcangel |
| Carlos Arturo Patino Restrepo | Patemuro | Member |
| Carlos Eduardo Nunez Bejarano | | Associate (Money Laundering) |
| Carlos Ernesto Saieh Jamis | | Key Business Associate |
| Carlos Umberto Restrepo Clavijo | | Front Person, Key Associate |
| Carmen Alicia Abadia Bastidas | | Business Partner, Mother of "Chupeta" |
| Carmen Elena Siman de Jaar | | Wife of Armando J. Jaar |
| Carmen Viviana Cifuentes Vargas | | Drug Trafficking Associate |
| Daniela Sabogal Zuluaga | | Key Family Member , Daughter of Orlando Sabogal |
| Davinson Gomez Ocampo | Gordo | Key Associate (Trafficking/Moneylaundering) |

| Name | Nickname | OFAC Identificaton |
|------|----------|-------------------|
| Diana Carolina Grajales Puentes | | Member, Daughter of Raul A. Grajales' |
| Diana Patricia Zuluaga Alzate | | Key Family Member, Wife of Orlando Sabogal |
| Diana Sarmiento Martinez | | Key Business Associate |
| Diego Leon Montoya Sanchez | Don Diego | Principal |
| Diego Perez Henao | Diego Rastrojo | Associate |
| Diego Uriel Alzate Jimenez | | Front Person |
| Duffay Gutierrez Aguirre | El Gordo Duffay | Drug Trafficking Associate |
| Edgar Marino Otalora Restrepo | | Key Business Associate, Manager of "Chupeta" companies |
| Eduardo Restrepo Victoria | El Socio | Associate |
| Edwin Amir Rengifo Ospina | | Key Associate |
| Elsa Yaneth Trivino Rodriguez | | Business Associate |
| Eugenio Montoya Sanchez | | Member, Brother of "Don Diego" |
| Fabio Roldan Salcedo | | Associate (Money Laundering) |
| Felipe Sabogal Zuluaga | | Key Family Member , Son of Orlando Sabogal |
| Fernando Gonzalez Sanclemente | | Front Person |
| Francisco Javier Duque Correa | | Key Business Associate |
| Gabriel Puerta Parra | El Doctor | Principal |
| German Duque Jaramillo | | Key Front Person (Medical) |
| German Rosero Angulo | | Key Associate |
| Gloria E. Londono Alvarez | | Member, Wife of Raul A. Grajales |
| Gloria Elena Fajardo Hernandez | | Associate |
| Guillermo Gonzalez Bohorquez | | Associate (Money Laundering) |
| Harvy Ramiro Rengifo Amaya | | Key Associate |
| Hector Leon | | Associate |
| Hernan Felipe Ramirez Garcia | | Key Business Associate |
| Hernando Echevarria Herrera | | Key Business Associate |
| Hilda Nelly Merchan Perilla | | Business Associate |
| Isabel Cristina Galvez Fernandez | | Wife of Gabriel Puerto Parra, Board Member of Intercontinental de Aviacion |
| Jaime Alberto Marin Zamora | Beto Marin | Key Associate |
| Jaime Antonio Olivella Celedon | | Business Associate |
| Jaime Rojas Franco | | Key Associate |
| Jairo Camilo Collazos Tello | | Front Person |
| Jairo Humberto Lopera Barbosa | | Front Person |
| Jairo Ivan Urdinola Grajales | | Principal |
| Jairo Jose Hurtado Romero | | Key Business Associate |
| Javier Antonio Calle Serna | Comba | Member, Brother fo Luis E. Calle Serna |
| James Augusto Osorio Valencia | | Key Business Associate |
| James Narvaez Puentes | | Key Associate |
| Javier Camacho Vallejo | | Key Associate, Front Person |
| Jefferson Rengifo Ospina | | Key Associate |

| Name | Nickname | OFAC Identificaton |
|------|----------|-------------------|
| Jhon Eidelber Cano Correa | Johnny Cano/ Alejandro Cardona Ribillas | Principal |
| Jhon Jairo Ramirez Lenis | | Key Business Associate |
| John Jairo Mendez Salazar | | Key Business Associate |
| Jorge Enrique Dominguez Velez | El Onli | Member |
| Jorge Enrique Lopreto Duran | | Key Business Associate |
| Jorge Rodrigo Salinas Cuevas | | Key Business Associate, Manager of "Chupeta" companies |
| Jose Aldemar Rendon Ramirez | | Key Associate (Trafficking/Moneylaundering) |
| Jose Ignacio Bedoya Velez | Nacho Bedoya | Key Associate |
| Jose Orlando Henao Montoya | | Associate |
| Jose Roberto Gonzalez Sanclemente | | Front Person |
| Juan Carlos Giraldo Franco | | Key Associate (Trafficking/Moneylaundering) |
| Juan Carlos Lopera Barbosa | | Front Person |
| Juan Carlos Montoya Sanchez | | Member, Brother of "Don Diego" |
| Juan Carlos Patino Torres | | Front Person |
| Juan Carlos Ramirez Abadia | Chupeta | Principal |
| Juan de la Cruz Gallego Cano | | Key Associate, Front Person |
| Juan Manuel Troncoso Posse | | Key Front Person (Agro-Industrial) |
| Juan Raul Grajales Londono | | Member, Son of Raul A. Grajales |
| Juliana Sabogal Zuluaga | | Key Family Member , Daughter of Orlando Sabogal |
| Julio Cesar Lopez Pena | Comba/ Julito | Member |
| Julio Fabio Urdinola Grajales | | Principal |
| Laura Victoria Gomez Aponte | | Key Business Associate |
| Lina Marclea Henao Gonzalez | | Member, Daughter of Arcangel |
| Lina Maria Grajales Londono | | Member, Daughter of Raul A. Grajales |
| Lina Rengifo Ospina | | Key Associate |
| Lorena Henao Montoya | | Sister of Arcangel/ Widow of Jairo Ivan Urdinola |
| Lubin Bohada Avila | | Key Business Associate |
| Luis Alfonso Gomez Bustamonte | | Front Person, Brother of "Rasguño" |
| Luis Alfredo Gallego Ramos | | Key Business Associate |
| Luis Antonio Hernandez Zea | EL Capitan | Principal |
| Luis Enrique Calle Serna | Comba/ Combatiente | Associate |
| Luis Hernan Valero Jimenez | | Associate |
| Luis Hernando Gomez Bustamante | Rasguño | Principal |
| Luis Holmes Alzate Jimenez | | Front Person |
| Luis Mario Cedeno Herrera | | Key Associate, Front Person |
| Manuel Antonio Cubillos Corredor | | Business Associate |
| Maria Cecilia Renteria Caicedo | | Beto Renteria Family, Front Company Shareholder |

| Name | Nickname | OFAC Identificaton |
|---|---|---|
| Maria Nury Caicedo Gallego | | Beto Renteria Family, Front Company Shareholder |
| Maria Ospina Prada | | Key Associate |
| Maria Sair Pelissier Ospina | | Key Business Associate |
| Maria Teresa Restrepo Victoria | | Associate |
| Mario German Satizabal Rengifo | Pelo de Cobre | Drug Trafficking Associate |
| Martha Cecilia Sanchez Conde | | Associate (Money Laundering) |
| Mauricio Arturo Espitia Ortiz | | Associate |
| Mauricio Pardo Ojeda | | Key Associate, Font Person |
| Melba Rosa Arce Jaramillo | | Business Associate |
| Melba Trejos Aguilar | | Key Business Associate |
| Milena Roldan Salcedo | | Associate (Money Laundering) |
| Moises Abdal Saieh Muvdi | | Key Business Associate |
| Monica Moreno Fernandez | | Key Associate |
| Nelson Salazar Lugo | | Front Person |
| Norma Constanza Restrepo Vicotra | | Associate |
| Olga Cecilia Gomez Jaramillo | | Member, Wife of "Rasguño" |
| Olga Patricia Gonzalez Benitez | | Member, Wife of Arcangel |
| Olga Patricia Henao Gonzalez | | Member, Daughter of Arcangel |
| Oliviero Perez Narvaez | | Business Associate |
| Omar Ramirez Ponce | | Business Partner, Father of "Chupeta" |
| Orlando Cifuentes Vargas | El Chute | Drug Trafficking Associate |
| Orlando Osorio Avila | | Key Business Associate |
| Orlando Sabogal Zuluaga a/k/a Carlos Alberto Guillen Jimemez a/k/a Juan Panlo Contreras Vivas | Caraqueso / Mono Sabogal | Principal |
| Oscar Hernandez | | Key Business Associate |
| Oscar Ignacio Martan Rodriguez | | Key Front Person (Agro-Industrial) |
| Piedad Rocio Sanchez Candela | | Associate |
| Piedad Velez Rengifo | | Member, Wife of Jose O. Heneao |
| Ramiro Rengifo Puentes | William Torrijos/La Llaveria | Member |
| Ramon A. Quintero Sanclemente | Don Tomas, El Ingeniero, Lucas | Principal |
| Raul Alberto Grajales Lemos | | Principal, Partner of Beto Renteria |
| Ricardo Alfredo Moreno Daza | | Key Business Associate |
| Ricardo Jaar Jassir | | Key Business Associate |
| Ricardo Sandoval Salazar | | Key Business Associate (Agro-Industrial) |
| Roberto Londono Velez | | Associate |
| Rodrigo Eugenio Saavedra Arce | | Associate (Money Laundering) |
| Sandra Milena Hernandez Arboleda | | Member |
| Sandra Milena Prieto Santiago | | Associate |
| Sergio Alberto Ramirez Rivera | | Key Associate |
| Servio Tulio Tascon Rojas | | Associate (Money Laundering) |
| Sonia Daysi Patino Fomeque | | Sister of Victor Patino |

| Name | Nickname | OFAC Identificaton |
|------|----------|--------------------|
| Sonia Patricia Grajales Bernal | | Member, Cousin of Raul A. Grajales |
| Sonia Trejos Aguilar | | Key Business Associate |
| Tulio Hernando Alzate Jimenez | | Front Person |
| Victor Julio Patiño Fomenque a/k/a Victor Hugo Patiño Fomenque | El Papi, EL Quimico | Principal |
| Victoria Eugenia Barrera Rios | | Associate |
| Viviana Gomez Gomez | | Member, Daughter of "Rasguño" |
| Walter Lopez Rodriguez | | Associate (Money Laundering) |
| Wilber Varela | Jabon / Don Jairo | Principal |
| William Velez Montes | | Key Business Associate |
| Wilmer de Jesus Gomez Bustamonte | | Front Person, Brother of "Rasguño" |
| Yanet Clifuentes Vargas | La Pecosa | Drug Trafficking Associate |
| Yolanda Salazar Arcila | | Associate |
| Yolanda Sofia Cano Alzate | | Key Associate, Front Person |
| Yudy Lorena Florez Grajales | | Key Business Associate |
| *Other Individuals or Entities Designated as Norte del Valle Cartel Members by the Office of Foreign Asset Control in the past, present, or future. | | |